WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Masako Ko,<br><br>                  Plaintiff,<br><br>v.<br><br>Carolyn W. Colvin,<br>Acting Commissioner of Social Security,<br><br>                  Defendant. | No. CV-15-08054-PHX-BSB<br><br>**ORDER** |

Masako Ko (Plaintiff) seeks judicial review of the final decision of the Commissioner of Social Security (the Commissioner) denying her application for benefits under the Social Security Act (the Act). The parties have consented to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b), and have filed briefs in accordance with Rule 16.1 of the Local Rules of Civil Procedure. For the following reasons, the Court reverses the Commissioner's decision and remands for a determination of benefits.

## I.    Procedural Background

On February 15, 2012, Plaintiff filed an application for a period of disability and disability insurance benefits under Title II of the Act. (Tr. 12.)[1] Plaintiff alleged that she had been disabled since July 1, 2011. (*Id.*) After the Social Security Administration (SSA) denied Plaintiff's initial application and her request for reconsideration, she

---

[1] Citations to Tr. are to the certified administrative transcript of record. (Doc. 11.)

1   requested a hearing before an administrative law judge (ALJ). (Tr. 71-72.) After
2   conducting a hearing, the ALJ issued a decision finding Plaintiff not disabled under the
3   Act. (Tr. 12-21.) This decision became the final decision of the Commissioner when the
4   Social Security Administration Appeals Council denied Plaintiff's request for review.
5   (Tr. 1–6; *see* 20 C.F.R. § 404.981 (explaining the effect of a disposition by the Appeals
6   Council).) Plaintiff now seeks judicial review of this decision pursuant to
7   42 U.S.C. § 405(g).

**II.     Administrative Record**

The record before the Court establishes the following history of diagnosis and treatment related to Plaintiff's alleged impairments. The record also includes opinions from state agency physicians who reviewed the records related to Plaintiff's impairments, but who did not examine Plaintiff or provide treatment.

**A.     Medical Treatment Evidence**

In June 2011, Plaintiff began treatment with Vasilios Kaperonis, M.D., at Mediterranean Mental Health Center, P.C. (Mediterranean). (Tr. 347-49.) During her first appointment with Dr. Kaperonis, Plaintiff reported having problems with a supervisor at work. (Tr. 347.) Plaintiff complained of anxiety attacks that lasted up to twenty minutes at a time. (*Id.*) On a mental status examination, Dr. Kaperonis noted that Plaintiff was well dressed, well groomed, and oriented. (Tr. 348.) Her mood was sad and anxious, and she had a tearful affect. (*Id.*) Plaintiff had no hallucinations, delusions, or suicidal ideations. (*Id.*) Dr. Kaperonis diagnosed anxiety disorder not otherwise specified, and prescribed Xanax. (*Id.*) Dr. Kaperonis also recommended that Plaintiff take an antidepressant, but she "was somewhat hesitant to do that at [that] time." (*Id.*)

During a July 8, 2011 appointment, Plaintiff reported that the day before her supervisor was scheduled to return to work she developed cold sores and decided "to take vacation time off and be away for a month . . . ." (Tr. 346.) Plaintiff reported that she had "a hard time motivating herself, a hard time concentrating, [was] easily derailed and distracted, [and did] not complete tasks . . . ." (*Id.*) Dr. Kaperonis observed that Plaintiff

1   was adequately groomed, alert, and oriented.  (*Id.*)  She had no delusions, hallucinations,
2   or suicidal ideations.  (*Id.*)  Dr. Kaperonis continued Plaintiff's prescription for Xanax
3   and also prescribed Viibryd.  (*Id.*)  Dr. Kaperonis later adjusted Plaintiff's medications
4   because she reported experiencing headaches after she started taking Viibryd, (Tr. 345.)

5         During an August 21, 2011 appointment, Plaintiff reported that she was reluctant to return to work.  (Tr. 344.)  She reported that she was sleeping better.  (*Id.*)  On a mental status examination, Plaintiff was well dressed, well groomed, cooperative, and alert.  (*Id.*)  She had an anxious mood and a constricted affect.  (*Id.*)  She had no delusions, hallucinations, or suicidal ideations.  (*Id.*)  During an August 29, 2011 appointment, Plaintiff reported anxiety and depression and stated that she "dread[ed] the idea of being back at work with a supervisor that she [could not] possibly work with."  (Tr. 343.)  Plaintiff reported disturbed sleep with nightmares and "occasional anxiety attacks."  (*Id.*)  Plaintiff stated that she had a hard time motivating herself and staying on task.  (*Id.*)  On examination, Plaintiff was adequately groomed, alert, and oriented.  (*Id.*)  She had no delusions, hallucinations, or suicidal ideations.  (*Id.*)  Dr. Kaperonis continued Plaintiff's medications and stated that she would "not be able to return to work at least for two years."  (*Id.*)  Treatments notes from an October 3, 2011 appointment include the same complaints and observations.  (Tr. 342.)

19        During a November 4, 2011 appointment, Plaintiff reported that "Xanax has helped her anxiety."  (Tr. 341.)  On examination, Plaintiff was well dressed, well groomed, alert, and oriented.  (*Id.*)  She had no delusions or hallucinations.  (*Id.*)  Plaintiff "denied suicidal intentions despite occasional suicidal thoughts."  (*Id.*)  During a December 5, 2011 appointment, Plaintiff reported a "lessening of her anxiety with the adjustment of her medications."  (*Id.*)  Plaintiff reported that she "was trying to keep herself occupied and [was] spending more time with other people but still tend[ed] to isolate significantly."  (Tr. 340.)  Plaintiff "talked about playing the piano and hiking."  (*Id.*)  On examination, Plaintiff was well dressed, well groomed, alert, and oriented.  (*Id.*)  She had no delusions, hallucinations, or suicidal ideations.  (*Id.*)

1    During a January 27, 2012 appointment, Plaintiff reported being more active
2 during the day, talking with friends, and feeling calmer. (Tr. 339.) Dr. Kaperonis noted
3 that Plaintiff "still isn't sleeping well, having nightmares and awakening with anxiety
4 attacks." (*Id.*) Plaintiff was tearful on examinaton. (*Id.*) She admitted having suicidal
5 thoughts without a specific plan. (*Id.*) Dr. Kaperonis prescribed Remeron in addition to
6 Xanax and Lexapro. (*Id.*) During a March 27, 2012 appointment, Plaintiff reported that
7 she was calmer on Lexapro, but that she was more motivated when she took Wellbutrin.
8 (Tr. 337.) Plaintiff reported that she was hiking "on occasions up to 4 miles a day and
9 this seems to help." (*Id.*) She reported that she was still having problems with her
10 appetite, anxiety, depression, and "her interests." (*Id.*) On examination, Plaintiff was
11 well dressed, well groomed, alert, and oriented. (*Id.*) Her mood was anxious and she had
12 a tense affect. She avoided eye contact. (*Id.*) She had no delusions, hallucinations, or
13 suicidal ideations. (*Id.*) Dr. Kaperonis continued Lexapro and Xanax, and added
14 Wellbutrin XL. (*Id.*)

15    In April 2012, Plaintiff reported feeling "more stable." (Tr. 336.) She was hiking
16 once a week and was considering volunteering at a senior center. (*Id.*) Plaintiff reported
17 that she checked on an elderly neighbor twice a day. (*Id.*) Plaintiff also reported that she
18 continued to have nightmares and occasionally awoke with panic attacks. (*Id.*) On
19 examination, Plaintiff was well dressed, well groomed, alert, and oriented. (*Id.*) Her
20 mood was anxious, she had a tense affect, and she continued to avoid eye contact. (*Id.*)
21 She had no delusions, hallucinations, or suicidal ideations. (*Id.*) Dr. Kaperonis continued
22 Plaintiff's medications. (*Id.*)

23    In July 2012, Plaintiff reported visiting a friend in South Dakota and stated that
24 she "seemed to relax while she was there." (Tr. 335.) However, she ran out of Lexapro
25 and Wellbutrin for two and a half weeks, during which time she felt more depressed and
26 anxious. (*Id.*) Dr. Kaperonis renewed Plaintiff's prescriptions for those medications.
27 (*Id.*) Plaintiff reported that she still tried to take care of her elderly neighbor. (*Id.*) On
28 mental status examination, Plaintiff was well dressed, well groomed, alert, and oriented.

1  (*Id.*)  Her "mood was sad and anxious and her affect was tense."  (*Id.*)  She had no
2  delusions, hallucinations, or suicidal ideation.  (*Id.*)  During an August 14, 2012
3  appointment Plaintiff's mental status examination was the same.  (Tr. 334.)  She reported
4  that she was trying to stay active, but it was difficult.  (*Id.*)  She reported having difficulty
5  with decision-making and memory.  (*Id.*)  Plaintiff also reported depression, lack of
6  confidence, anxiety, and panic attacks.  (*Id.*)  Dr. Kaperonis continued Plaintiff's
7  medications.  (*Id.*)  In September 2012, Plaintiff reported that she was "trying to be more
8  active but still experience[d] anxiety and ha[d] difficulty making decisions and ha[d]
9  memory problems."  (Tr. 333.)  On mental status examination, Plaintiff was well dressed,
10 well groomed, alert, and oriented.  (*Id.*)  Her mood was "somewhat anxious and sad and
11 her affect was tense."  (*Id.*)  She avoided eye contact.  (*Id.*)  She had no delusions,
12 hallucinations, or suicidal ideations.  (*Id.*)  Dr. Kaperonis continued Plaintiff's
13 medications.

14 During a November 1, 2012 appointment, Plaintiff reported that she continued to
15 experience anxiety and depression and was not sleeping well.  (Tr. 332.)  She reported
16 that she was not very active and had been socially withdrawn.  (*Id.*)  On examination,
17 Plaintiff was well dressed, well groomed, alert, and oriented.  (*Id.*)  Her "cognitive
18 functioning [was] grossly intact."  (*Id.*)  Plaintiff's "recent and remote and immediate"
19 memory were "overall good."  (*Id.*)  She had a sad and anxious mood and her affect was
20 "broad in range."  (*Id.*)  "There [was] no loosening of associations[,] no pressure of
21 speech[,] and no flight of ideas."  (*Id.*)  There was no thought blocking.  (*Id.*) Plaintiff had
22 no delusions, hallucination, referential thoughts, or suicidal thoughts.  (*Id.*)  Plaintiff had
23 good insight and judgment, and her "reality testing" was intact.  (*Id.*)  Dr. Kaperonis
24 continued Plaintiff's medications.  (*Id.*)  A November 7, 2012 treatment note includes
25 similar findings on mental status examination.  (Tr. 331.)

26 During a January 16, 2013 appointment, Plaintiff continued to report anxiety,
27 "symptoms of panic and problems with sleep."  (Tr. 380.)  On mental status examination,
28 Dr. Kaperonis made findings similar to those he made on November 1, 2012.  (*Compare*

Tr. 380 *with* Tr. 332.)  Dr. Kaperonis continued Plaintiff's medications.  (Tr. 380.) During a February 26, 2013 appointment, Plaintiff reported feeling tired, unmotivated, and depressed.  (Tr. 377.)  She was worried about her memory and thought it was getting worse.  (*Id.*)  On examination, Dr. Kaperonis made findings similar to those he made on November 1, 2012 and January 16, 2013.  (*Compare* Tr. 377 *with* Tr. 380 and Tr. 332.) Dr. Kaperonis continued Plaintiff's medications with some adjustments.  (Tr. 377.)

During a March 26, 2013 appointment, Plaintiff reported some increased energy and activity on a new dosage of Wellbutrin.  (Tr. 376.)  She reported experiencing anxiety attacks "almost weekly."  (*Id.*)  Dr. Kaperonis's examination findings were similar to those he made in November 2012 and in January and February 2013.  (*See* Tr. 376, 332, 380, 377.)  Dr. Kaperonis continued Plaintiff's medications. (Tr. 376.)  An April 25, 2013 treatment note includes reports and findings similar to the March 26, 2013 treatment note.  (*Compare* Tr. 375 *with* Tr. 376.)

### B. Medical Opinion Evidence

#### 1. Winston Brown, M.D.

On June 1, 2012, Dr. Brown reviewed the record and completed a Mental Residual Functional Capacity (RFC) Assessment as part of the initial determination on Plaintiff's application for benefits.  (Tr. 283-86.)  Dr. Brown opined that Plaintiff was moderately limited in the following areas: her ability to accept instructions and respond appropriately to criticism from supervisors; her ability to get along with co-workers or peers without distracting them or exhibiting extreme behavior; her ability to respond appropriately to changes in the work setting; and her ability to set realistic goals or make plans independently of others.  (Tr. 285.)  Dr. Brown found that the medical record and Plaintiff's activities of daily living (ADLs) "show[ed] some motivational deficit. Moderate ADLs/Sx's [symptoms] are credible."  (Tr. 286.)

On June 1, 2012, Dr. Brown also completed a Psychiatric Review Technique form. (Tr. 287.)  Dr. Brown identified Plaintiff's diagnosis as anxiety disorder not otherwise specified.  (Tr. 287, 292.)  Dr. Brown opined that Plaintiff was mildly limited in her

1 activities of daily living and in her ability to maintain concentration, persistence, or pace.
2 (Tr. 297.)  Dr. Brown found Plaintiff moderately limited in her ability to maintain social
3 functioning.  (*Id.*)

### 2. Sheri L. Simon, Ph.D

On December 17, 2012, as part of the reconsideration determination, Dr. Simon reviewed the record and completed a Case Analysis form.  (Tr. 352)  Dr. Simon stated that she "reviewed all of the evidence in the file." (Tr. 352.)  She concluded that Plaintiff was "functional."  (*Id.*)  She stated that "[w]hile there are some difficulties, the [Plaintiff] is independent in personal care, makes simple meals, does [household] chores, drives, goes out alone, shops, manages finances, socializes with 1 friend." (*Id.*)  Dr. Simon found that "[w]hile [Plaintiff] does have some difficulties there is no objective evidence to indicate significant worsening or marked impairments." (*Id.*)

### 3. Vasilios Kaperonis, M.D.

On September 2011, Dr. Kaperonis completed a Lake Havasu City Certification of Health Care Provider.  (Tr. 281-82.)  He stated that Plaintiff had anxiety and depression. (Tr. 281.)  He opined that Plaintiff was "incapacitated and [would] be incapacitated for two years," and could not perform any work.  (Tr. 281-82.)

On December 30, 2011, Dr. Kaperonis completed an Attending Physician's Statement of Disability.  (Tr. 279.)  Dr. Kaperonis noted that Plaintiff had post-traumatic stress disorder, anxiety disorder, major depression, suicidal thoughts, and difficulty concentrating.  (*Id.*)  He opined that Plaintiff was incapacitated by severe depression, anxiety, and feelings of hopelessness.  (*Id.*)

On January 23, 2013, Dr. Kaperonis completed a Supplemental Questionnaire as to Residual Functional Capacity (RFC Questionnaire).  (Tr. 378-79.)  Dr. Kaperonis opined that Plaintiff was moderately limited in her abilities to understand, remember, and carry out short, simple instructions and her ability to make "judgments on simple work-

related decisions."[2] (Tr. 378.) He found Plaintiff markedly limited in her ability to understand and remember detailed instructions, interact appropriately with the public and co-workers, and respond appropriately to work pressures in a usual work environment and to changes in a routine work setting. (Tr. 378-79.) Finally, he found Plaintiff extremely limited in her ability to interact appropriately with supervisors. (Tr. 379.) Dr. Kaperonis explained that Plaintiff had "severe symptoms of anxiety and panic and her thinking [was] clouded by depressive symptomology (ie sadness, decreased concentration and difficulty focusing, crying spells fatigue, etc.)." (*Id.*)

### III. Plaintiff's Subjective Complaints and the Administrative Hearing

As part of her application for benefits, Plaintiff completed a Function Report. (Tr. 192-199.) She stated that she was unable to work because of her lack of focus and concentration, caused by anxiety and depression. (Tr. 192.) She stated that her impairments affected her memory, concentration, and her abilities to understand, follow instructions, and complete tasks. (Tr. 197.) She stated that she did not "finish what [she] start[ed]." (*Id.*) In response to a question asking "[h]ow well do you follow" written and spoken instructions, Plaintiff answered "not well." (*Id.*) Plaintiff stated that she handled stress "terribl[y]" and did not respond well to changes in routine. (Tr. 198.) She also stated that she was "nervous" around authority figures, such as "bosses." (*Id.*)

Plaintiff reported that she "rarely" spent time with others, but talked with her "one good friend" "almost daily." (Tr. 196.) Plaintiff reported that she had "problems getting along with family, friends, neighbors, or others." (Tr. 197.) Plaintiff explained that she had lost confidence and that her "social life [had] decreased tremendously." (*Id.*)

Plaintiff testified during the administrative hearing. Plaintiff was 52 years old at the time of the administrative hearing and the ALJ's decision. (Tr. 19.) She had a high school education. (*Id.*) Plaintiff had past relevant work as an associate faculty member

---

[2] The RFC questionnaire defined the ratings as follows: (1) moderate, "[m]oderate limitations, claimant's impairments reduce ability to function (10% off task)"; (2) marked, "[s]erious limitations, claimant's ability to function is severely limited (11-15% off task)"; (3) extreme, "[m]ajor limitations, claimant has no useful ability to function (greater than 15% off task)." (Tr. 378.)

1  and a recreation supervisor. (Tr. 19, 40.) Plaintiff testified that she had not worked since
2  July 2011. (Tr. 40.) She explained that she could not return to her job because she had
3  difficulty concentrating, getting along with people, and interacting with the public.
4  (Tr. 43-44.) She testified that she took several medications to help with anxiety. (Tr. 44-
5  45.) Plaintiff testified that she had been seeing Dr. Kaperonis since 2011, but her issues
6  had not improved and her inability to focus and stay on task prevented her from
7  completing a regular work day. (Tr. 48-50.)

8  A vocational expert testified at the administrative hearing. (Tr. 50-56.) The ALJ
9  asked the vocational expert to assume work that included "no exertional limitation; the
10 work would be nonpublic, noncomplex; there would be no ladders, ropes, or scaffolds; no
11 hazardous machinery; and no unprotected heights." (Tr. 51.) The vocational expert
12 testified that an individual with Plaintiff's education, work experience, and skills could
13 perform this type of work, which would include laundry laborer, cleaner, and hand
14 packager. (Tr. 51-52.) The vocational expert testified that an individual with the
15 moderate and marked limitations that Dr. Kaperonis identified in 2013 would be unable
16 to perform sustained work.[3] (Tr. 52-55, 378-79.)

17 **IV.   The ALJ's Decision**

18 A claimant is considered disabled under the Social Security Act if she is unable
19 "to engage in any substantial gainful activity by reason of any medically determinable
20 physical or mental impairment which can be expected to result in death or which has
21 lasted or can be expected to last for a continuous period of not less than 12 months."
22 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (nearly identical standard
23 for supplemental security income disability insurance benefits). To determine whether a
24 claimant is disabled, the ALJ uses a five-step sequential evaluation process.
25 *See* 20 C.F.R. §§ 404.1520, 416.920.

---

28  [3] Based on the limitations identified in Dr. Kaperonis's 2013 opinion, the ALJ estimated that Plaintiff would be "off task . . . more than half the day." (Tr. 54-55.)

### A. The Five-Step Sequential Evaluation Process

In the first two steps, a claimant seeking disability benefits must initially demonstrate (1) that she is not presently engaged in a substantial gainful activity, and (2) that her medically determinable impairment or combinations of impairments is severe. 20 C.F.R. §§ 404.1520(b) and (c), 416.920(b) and (c). If a claimant meets steps one and two, there are two ways in which she may be found disabled at steps three through five. At step three, she may prove that her impairment or combination of impairments meets or equals an impairment in the Listing of Impairments found in Appendix 1 to Subpart P of 20 C.F.R. Part 404. 20 C.F.R. §§ 404.1520(a)(4)(iii) and (d), 416.920(d). If so, the claimant is presumptively disabled. If not, the ALJ determines the claimant's RFC. 20 C.F.R. §§ 404.1520(e), 416.920(e). At step four, the ALJ determines whether a claimant's RFC precludes her from performing her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If the claimant establishes this prima facie case, the burden shifts to the government at step five to establish that the claimant can perform other jobs that exist in significant numbers in the national economy, considering the claimant's RFC, age, work experience, and education. 20 C.F.R. §§ 404.1520(g), 416.920(g). If the government does not meet this burden, then the claimant is considered disabled within the meaning of the Act.

### B. The ALJ's Application of the Five Step Evaluation Process

Applying the five-step sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date, July 1, 2011. (Tr. 14.) At step two, the ALJ found that Plaintiff had the following severe impairments: "anxiety disorder, with depression (20 CFR § 404.1520(c))." (*Id.*) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of a listed impairment. (*Id.*) The ALJ next found that Plaintiff had the RFC to "perform a full range of work at all exertional levels but with the following nonexertional limitations: non-public, non-complex work; no ladders, ropers, or scaffolds; and the claimant must avoid hazardous machinery and

unprotected heights." (Tr. 16.) The ALJ found that Plaintiff could not perform her past relevant work, but could perform other work that existed in significant numbers in the national economy. (Tr. 19-20.) He concluded that Plaintiff had not been under a disability as defined in the Act from July 1, 2011 through the date of his decision. (Tr. 21.) Therefore, the ALJ denied Plaintiff's application for a period of disability and disability insurance benefits. (*Id.*)

## V.     Standard of Review

The district court has the "power to enter, upon the pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The district court reviews the Commissioner's final decision under the substantial evidence standard and must affirm the Commissioner's decision if it is supported by substantial evidence and it is free from legal error. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008). Even if the ALJ erred, however, "[a] decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

Substantial evidence means more than a mere scintilla, but less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations omitted); *see also Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005). In determining whether substantial evidence supports a decision, the court considers the record as a whole and "may not affirm simply by isolating a specific quantum of supporting evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal quotation and citation omitted). The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation, [the court] must defer to the ALJ's conclusion."

*Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing *Andrews*, 53 F.3d at 1041).

**VI.    Plaintiff's Claims**

Plaintiff raises the following claims: (1) the ALJ erred "by rejecting the assessments of [Plaintiff's] long-time treating psychiatrist [and] instead relying on assessment forms completed by state agency doctors," and (2) the ALJ erred by rejecting Plaintiff's symptom testimony without providing clear and convincing reasons. (Doc. 23 at 1, 2)  The Commissioner asserts that the ALJ's decision is free from harmful error and is supported by substantial evidence. (Doc. 32.)  The Court considers Plaintiff's claims below and finds that the ALJ erred in rejecting the 2013 opinion of Plaintiff's treating physician. Because the Court concludes that this error was not harmless, the Court does not address Plaintiff's second claim that the ALJ erred by rejecting Plaintiff's symptom testimony.

**A.    Weight Assigned to Medical Source Opinions**

Plaintiff argues that the ALJ erred in weighing the medical source opinion evidence. (Doc. 23 at 1, 16-25.)  In weighing medical source opinion evidence, the Ninth Circuit distinguishes between three types of physicians: (1) treating physicians, who treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Generally, more weight is given to a treating physician's opinion. *Id*.  The ALJ must provide clear and convincing reasons supported by substantial evidence for rejecting a treating or an examining physician's uncontradicted opinion. *Id.*; *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  An ALJ may reject the controverted opinion of a treating or an examining physician by providing specific and legitimate reasons that are supported by substantial evidence in the record. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Reddick*, 157 F.3d at 725.

1     Opinions from non-examining medical sources are entitled to less weight than
2 opinions from treating or examining physicians. *Lester*, 81 F.3d at 831. Although an
3 ALJ generally gives more weight to an examining physician's opinion than to a non-
4 examining physician's opinion, a non-examining physician's opinion may nonetheless
5 constitute substantial evidence if it is consistent with other independent evidence in the
6 record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). When evaluating
7 medical opinion evidence, the ALJ may consider "the amount of relevant evidence that
8 supports the opinion and the quality of the explanation provided; the consistency of the
9 medical opinion with the record as a whole; [and] the specialty of the physician providing
10 the opinion . . . ." *Orn*, 495 F.3d at 631.

11    As previously stated, Plaintiff argues that the ALJ erred by assigning no weight to
12 treating physician Dr. Kaperonis's 2011 and 2013 opinions without providing legally
13 sufficient reasons. (Doc. 23 at 16-25.) Plaintiff states that the ALJ's rejection of the
14 2013 opinion is the most significant issue because the vocational expert's testimony that
15 Plaintiff could not sustain regular employments is based on that opinion. (Doc. 23 at 17.)
16 The Court agrees that the 2013 opinion is the most significant opinion. The parties
17 dispute whether Dr. Kaperonis's 2013 opinion was uncontradicted, which would require
18 the ALJ to provide clear and convincing reasons for discounting the physician's opinion,
19 rather than specific and legitimate reasons. (Doc. 23 at 16; Doc. 32 at 7.) The Court does
20 not need to resolve this issue because the ALJ's reasons for rejecting Dr. Kaperonis's
21 2013 opinion do not satisfy either standard. As discussed below, the Court finds that the
22 ALJ erred in rejecting the treating physician's 2013 opinion. Therefore, the Court does
23 not need to consider whether the ALJ also erred in rejecting Dr. Kaperonis's 2011
24 opinion.

25    As previously noted, on the January 2013 RFC Questionnaire, Dr. Kaperonis
26 opined that Plaintiff was moderately limited in her abilities to understand, remember, and
27 carry out short, simple instructions and her ability to make "judgments on simple work-
28 related decisions." (Tr. 378.) He also found Plaintiff markedly limited in her ability to

understand and remember detailed instructions, interact appropriately with the public and co-workers, and respond appropriately to work pressures in a usual work environment and to changes in a routine work setting. (Tr. 378-79.) Finally, he found Plaintiff extremely limited in her ability to interact appropriately with supervisors. (Tr. 379.)

The ALJ gave Dr. Kaperonis's 2013 opinion no weight because the ALJ concluded that it appear[ed] to have been completed as an accommodation to the [Plaintiff]." (Tr. 18.) The ALJ also rejected the 2013 opinion because it was provided on a checklist-style form, and the ALJ believed that Dr. Kaperonis's treatment notes did not support the level of impairment assessed. (*Id.*) Plaintiff asserts that the ALJ erred by rejecting Dr. Kaperonis's 2013 opinion on these grounds. As set forth below, the Court agrees.

### 1. Accommodation for Plaintiff

Plaintiff asserts that the ALJ erred by rejecting Dr. Kaperonis's opinion based on the ALJ's conclusion that it was given as an accommodation for Plaintiff. (Doc. 23 at 19-20.) The Commissioner argues that there was no error because an ALJ may consider the motivation for an opinion. (Doc. 32 at 12-13.) The Court finds that the ALJ erred.

The regulations state that when considering medical evidence, the Agency will consider, among other things, "factors . . . which tend to support or contradict the opinion." 20 C.F.R. § 404.1527(c)(6). Based on that regulation, and on the Ninth Circuit's decision in *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006), the Commissioner asserts that the ALJ did not err by rejecting Dr. Kaperonis's opinion on the ground that it was given as an accommodation for Plaintiff. (Doc. 32 at 12-13.) In *Greger*, the court affirmed the ALJ's rejection of a lay witness's testimony about the claimant's symptoms based on the ALJ's conclusion that the lay witness had a "close relationship" with the claimant and was "possibility influenced by her desire to help him." *Greger*, 464 F.3d at 972.

The Ninth Circuit's decision in *Greger* does not support the Commissioner's defense of the ALJ's rejection of Dr. Kaperonis's opinion for two reasons. First, *Greger*

found that a close relationship with the claimant was a "germane" reason for discounting a lay witness's opinion. *Greger*, 464 F.3d at 972. However, that decision did not indicate whether a medical source's close relationship with a claimant would constitute either "specific and legitimate" or "clear and convincing" reasons that are required to reject a treating physician's opinion. *See Bayliss*, 427 F.3d at 1216*; Reddick*, 157 F.3d at 725. Second, unlike the ALJ in *Greger,* the ALJ in this case assumed without providing any supporting reasons — such as the existence of a close relationship — that the ALJ gave the 2013 opinion as an accommodation. (Tr. 18.)

Moreover, the Ninth Circuit recognizes that an ALJ may not reject a medical opinion that is favorable to the claimant merely because the ALJ suspects that the doctor is sympathetic to the claimant. *See Reddick v. Chater*, 157 F.3d 715, 727 (9th Cir. 1998) ("[T]he mere fact that a medical report is provided at the request of counsel or, more broadly, the purpose for which an opinion is provided, is not a legitimate basis for evaluating the reliability of the report."); *Lester*, 81 F.3d at 832 ("The [Commissioner] may not assume that doctors routinely lie in order to help their patients collect disability benefits," but may "introduce evidence of actual improprieties" in physicians' opinions). Because the ALJ concluded that Dr. Kaperonis's 2013 opinion was given as an accommodation for Plaintiff without providing any support for that conclusion, the ALJ improperly rejected Dr. Kaperonis's opinion on that basis.

### 2. Checklist-Style Form

The ALJ also explained that he rejected Dr. Kaperonis's 2013 opinion because it was on a "checklist-style form" and included conclusions without any rationale. (Tr. 18.) Plaintiff asserts that the ALJ erred by rejecting the 2013 opinion on this basis. (Doc. 23.) The Commissioner defends this rationale. (Doc. 32 at 13.) As set forth below, the Court finds that the ALJ erred.

As the ALJ noted, Dr. Kaperonis's 2013 opinion is provided on a check-box form. (Tr. 378-79.) The ALJ criticized the opinion because it consisted of "only conclusions regarding functional limitations without any rationale for those conclusions." (Tr. 18.)

As Plaintiff argues, that statement is inaccurate because Dr. Kaperonis explained that the limitations he assessed on the form were based on Plaintiff's "severe symptoms of anxiety and panic." (Tr. 379.) Dr. Kaperonis further stated that Plaintiff's "thinking is clouded by depressive symptomology (i.e. sadness, decreased concentration and difficulty focusing, crying spells, fatigue etc.)." (*Id.*) Accordingly, the ALJ's conclusion that Dr. Kaperonis did not explain the basis for his opinions on the RFC Questionnaire is not supported by the record. *See Orn*, 495 F.3d at 629 (permitting reliance on "Multiple Impairment Questionnaire[s]" completed by treating physician).

Additionally, the ALJ failed to recognize that Dr. Kaperonis's opinions expressed on the checklist-style form were based on his several year treatment history with Plaintiff. Dr. Kaperonis's treatment notes frequently mention Plaintiff's social withdrawal, problems with a supervisor, and anxiety. (Tr. 332, 333, 336, 340, 343, 346, 347, 376, 380.) Therefore, Dr. Kaperonis's opinions were entitled to weight that an "otherwise unsupported and unexplained check-box form would not merit." *Garrison v. Colvin*, 759 F.3d 995, 1013 (9th Cir. 2014); *see also Mansour v. Astrue*, 2009 WL 272865, at *6 n.14 (C.D. Cal. Feb. 2, 2009) (rejecting contention that a treating physician's opinion on a "check-the-box" form lacked supporting evidence to substantiate the responses on the form because the physician's treatment notes in the record supported his finding on the opinion form).

### 3. Unsupported by Treatment Record

Finally, the ALJ rejected Dr. Kaperonis's 2013 opinion because he believed it was unsupported by Dr. Kaperonis's "treating record." (Tr. 18.) To support this conclusion, the ALJ cited the following passage from an April 25, 2013 treatment note:

> The patient is well-dressed and well-groomed. Cognitive functioning is grossly intact. The patient is alert and oriented to all spheres. Memory recent and remote and immediate overall good. The mood is sad and the affect is broad in range. There is no loosening of associations no pressure of speech and no flight of ideas. There is no thought blocking. There are no delusions and no hallucinations as well as no referential thoughts. There is no suicidal thinking and no homicidal thinking. Insight is good and judgment is good and reality testing is intact.

- 16 -

(Tr. 18-19 (citing Admin. Hrg. Ex. 14F at 1)).) As the Commissioner notes (Doc. 32 at 14), this passage is included in several other treatment notes. (Tr. 331, 332, 372, 376, 380). The ALJ, however, did not explain how this passage detracted from Dr. Kaperonis's 2013 opinion. (Tr. 18-19.) Dr. Kaperonis found Petitioner markedly limited in her abilities to interact appropriately with the public and co-workers, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting. (Tr. 379.) He also found Plaintiff extremely limited in her ability to respond appropriately to supervisors. (*Id.*) The ALJ did not explain how Dr. Kaperonis's findings regarding Plaintiff's appearance, cognitive functioning, memory, insight, judgment, and thought content, which were included in the April 25, 2013 treatment note that the ALJ cited, detracted from Dr. Kaperonis's opinions regarding limitations in Plaintiff's abilities to interact with others and respond to changes in a work setting. *See Ghanin*, 763 F.3d at 1164 (noting that "observations of cognitive functioning during therapy sessions do not contract Ghanin's reported symptoms of depression and social anxiety."). The ALJ's failure to "build a bridge between the evidence cited and [his] conclusions" is error. *See Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011).

**VII.   Summary and Remedy**

Considering the record as a whole, the Court concludes that the ALJ erred in rejecting the treating physician's 2013 opinion. That error was not harmless because the vocational expert testified that an individual with the limitations identified in that opinion would be unable to sustain work. (Tr. 52-55, 378-79.) Therefore, the Court reverses the Commissioner's disability determination.

Because the Court has decided to vacate the Commissioner's decision, it has the discretion to remand the case for further development of the record or for an award benefits. *See Reddick v. Chater*, 157 F.3d 715, 728 (9th Cir. 1998). The decision to remand for benefits is controlled by the Ninth Circuit's "three-part credit-as-true standard." *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014). Under that standard,

evidence should be credited as true and an action remanded for an immediate award of benefits when each of the following factors are present: "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant's testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Id.* (citing *Ryan v. Comm'r Soc. Sec.*, 528 F.3d 1194, 1202 (9th Cir. 2008)); *see also Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004). As discussed below, Plaintiff has satisfied all three factors of the credit-as-true rule.

### A.     The First Factor

On the first factor, there is no need to further develop the record. *See Garrison*, 759 F.3d at 1021 (citing *Benecke*, 379 F.3d at 595) ("Allowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication.")). The Commissioner suggests that further proceedings are necessary because there are inconsistencies in the record. (Doc. 32 at 20.) The Commissioner asserts that Dr. Kaperonis's opinion that Plaintiff had social problems conflicts with Plaintiff's self–reports that did not identify problems getting along with others. (Doc. 32 at 20 (citing Tr. 379, 148-50, 196-97).) To support this argument, the Commissioner cites two functions reports that Plaintiff completed. On a May 12, 2012 report (Tr. 144-151), Plaintiff indicated that she talked to "others" daily and got along "fine" with authority figures. (Tr. 148.) These statements on the May 2012 function report appear inconsistent with Dr. Kaperonis's 2013 opinion.

However, on a November 12, 2012 function report that Plaintiff completed approximately three months before Dr. Kaperonis completed the RFC Questionnaire, Plaintiff reported that she could not be around people, "rarely" spent time with others, talked with her "one good friend" daily, her social life had "decreased tremendously," and authority figures made her nervous. (Tr. 192-97.) Similarly, during a November 1, 2012 appointment with Dr. Kaperonis, Plaintiff reported that she had not been very active

1  and was socially withdrawn.  (Tr. 332.)  Additionally, in December 2011, Plaintiff
2  reported being socially withdrawn.[4]  (Tr. 340.)  Contrary to the Commissioner's
3  assertion, these treatment notes are consistent with Plaintiff's November 2012 function
4  report.  (Doc. 32 at 20 (citing Tr. 332, 340).)  Although Plaintiff's May 2012 function
5  report did not indicate that she had problems getting along with others, Plaintiff reported
6  such problems on a November 2012 function report and to Dr. Kaperonis.  Therefore, the
7  Court does not find an inconsistency between Plaintiff's self-reports and Dr. Kaperonis's
8  2013 opinion that would require further administrative proceedings.

### B.     The Second and Third Factors

On the second factor, the Court has concluded that the ALJ failed to provide legally sufficient reasons for rejecting the 2013 opinion of treating physician Dr. Kaperonis.  On the third factor, if the discredited evidence were credited as true, the ALJ would be required to find Plaintiff disabled on remand because the vocational expert testified that a person with the limitations that Dr. Kaperonis identified would be incapable of sustained full-time work.  Therefore, based on this evidence, Plaintiff is disabled.  *See Garrison*, 759 F.3d at 1022, n.28 (stating that when the vocational expert testified that a person with the plaintiff's RFC would be unable to work, "we can conclude that [the plaintiff] is disabled without remanding for further proceedings to determine anew her RFC.").

Having concluded that Plaintiff meets the three criteria of the credit-as-true rule, the Court considers "the relevant testimony [and opinion evidence] to be established as true and remand[s] for an award of benefits[,]" *Benecke*, 379 F.3d at 593 (citations omitted), unless "the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled with the meaning of the Social Security Act." *Garrison*, 759 F.3d at 1021) (citations omitted).  Considering the record as a whole, there is no reason for serious doubt as to whether Plaintiff is disabled.  *See id.*  The ALJ failed to set forth

---

[4] The Commissioner cites to this report and mistakenly states that it was completed "within days" of when Plaintiff completed the function report in November 2012.  (Doc. 32 at 20 (citing Tr. 332, 340).)

specific and legitimate reasons supported by substantial evidence for rejecting Dr. Kaperonis's 2013 opinions. When a hypothetical question was posed to the vocational expert incorporating those limitation, the vocational expert testified that such limitations would preclude an individual from sustained work activity. On the record before the Court, Dr. Kaperonis's 2013 opinion should be credited as true and the case remanded for an award of benefits.

Accordingly,

**IT IS ORDERED** that the Commissioner's decision denying benefits is reversed and this matter is remanded for a determination of benefits.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment in favor of Plaintiff and terminate this case.

Dated this 31st day of May, 2016.

_____
Bridget S. Bade
United States Magistrate Judge